838 So.2d 141 (2003)
Ronald DARBY
v.
GILBERT RICHARD, INC. and Gilbert Richard, Individually.
No. 02-1154.
Court of Appeal of Louisiana, Third Circuit.
February 5, 2003.
*142 Donald W. Price, Baton Rouge, LA, for Plaintiff/Appellant, Ronald Darby.
Michael D. Meyer, New Orleans, LA, for Defendant/Appellee, Gilbert Richard.
Court composed of JOHN D. SAUNDERS, BILLIE COLOMBARO WOODARD, and ELIZABETH A. PICKETT, Judges.
SAUNDERS, Judge.
Appellant, Ronald Darby, appeals from a judgment of the Office of Workers' Compensation finding (1) that the appellant failed to prove, by a preponderance of evidence, that he had an "accident" at work resulting in objective findings of an injury, and (2) that the claimant's testimony was based on inconsistencies, untruths, *143 and misrepresentations, in violation of La. R.S. 23:1208 resulting in a forfeiture of all benefits, full restitution to the Defendant, Gilbert Richard, and a fine in the amount of $5,000.00. For the reasons stated below, we affirm the findings of the Workers' Compensation Judge (WCJ).

FACTS AND PROCEDURAL HISTORY
It is undisputed that on November 20, 2000, while in the course and scope of his employ as a driver of sugar cane trucks, Ronald Darby was involved in a motor vehicle accident. A motorist drove underneath the trailer of Mr. Darby's truck after losing control of his vehicle. After realizing that he had been involved in an accident, Mr. Darby applied the breaks of his vehicle. Upon applying the truck's breaks, Mr. Darby claims the truck began to shake violently, resulting in his being thrown about the cab of the truck. Approximately one week after the accident Mr. Darby was fired by Mr. Richard for reasons unrelated to the accident or his alleged resulting injuries.
Mr. Darby maintains that, as a result of the accident, he injured his knees and back, and subsequently began to experience severe back and leg pain which has rendered him unable to work. Following the accident, and his being fired by Mr. Richard, Mr. Darby's condition allegedly began to deteriorate. He finally sought medical treatment from Dr. Keith Mack on December 27, 2000, at which time Mr. Darby complained of increasing pain in his legs and low back, and that his legs began to give out on him.
Upon examination of Mr. Darby, Dr. Mack found muscle spasm along with subjective symptoms of tenderness and decreased range of motion. Dr. Mack continued treating Mr. Darby through March 29, 2001. When Mr. Darby's low back and leg symptoms failed to improve, he sought treatment from hospital emergency rooms. He went to the emergency room at Iberia Medical Center on February 6, 2001 and March 22, 2001. He also sought treatment from the Dauterive Hospital Emergency Room on March 29, 2001. On May 16, 2001, Mr. Darby reported to Lafayette General Hospital's Emergency Room where he received an MRI showing spondylolisthesis and possible central disk herniation at L5-S1.
On May 26, 2001, Mr. Darby again returned to Lafayette General and was admitted for observation for several days. While admitted at Lafayette General, Mr. Darby began seeing Dr. John Cobb, who continued to provide follow up care for Mr. Darby after his discharge. In office visit follow-ups with Mr. Darby, Dr. Cobb ordered an EMG and a nerve conduction study, which showed bilateral L-5 radicular changes. Dr. Cobb recommended surgery to remove the disk, decompress the nerves, and fuse the unstable space at L5-S1. Mr. Darby has not yet undergone this recommended surgery, and to date his medical expenses total $11,129.46.
The matter was heard on May 22, 2002, by Judge Glynn F. Voisin of the Office of Workers' Compensation, District 9. Mr. Richard moved for involuntary dismissal, which the WCJ took under advisement, and a judgment was rendered on June 28, 2002. The WCJ denied the motion for involuntary dismissal, found that Mr. Darby failed to meet his burden of proof establishing that his current disability was caused by the work-related accident of November 20, 2000, and therefore, Mr. Darby was not entitled to disability or medical benefits. Additionally, the WCJ found that Mr. Darby made material misrepresentations in his testimony, which violated La.R.S. 23:1208 and resulted in a forfeiture of his right to compensation benefits. In his written reasons for judgment the *144 WCJ outlined forty-three findings of fact documenting the inconsistencies in Mr. Darby's testimony, and illustrating the basis for the WCJ's finding that Mr. Darby's testimony lacked credibility.

STANDARD OF REVIEW
The standard of review for appellate courts in workers' compensation cases is well established and it is clearly set out in Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840, pp. 7-8 (La.7/1/97); 696 So.2d 551, 556 as follows:
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of review. Smith v. Louisiana Dep't of Corrections, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; Freeman v. Poulon/Weed Eater, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Freeman, 93-1530 at p. 5, 630 So.2d at 737-38; Stobart v. State, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990).
In Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), the supreme court recognized that the complex nature of evaluating truthfulness and credibility is more properly determined at the trial level by the factfinder rather than by a court of appeal, which bases its determinations on a review of the cold record. Therefore, the court held that the deference given to the trier of fact is particularly great when evaluating the weight to be given to witness testimony:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Id. at 844. (citations omitted).

ARGUMENT

Assignment of Error # 1
In Mr. Darby's first assignment of error, he claims that the WCJ committed legal error, or alternatively, manifest error, in failing to find that his injury was caused by an on-the-job accident. He claims that the WCJ failed to apply the appropriate presumption of causation, and that the WCJ failed to hold Mr. Richard, who questioned factual causation, to the appropriate standard of proving alternative causation. For the reasons stated below, we find Mr. Darby's argument to be without merit.
In Bruno v. Harbert Int'l Inc., 593 So.2d 357, 361 (La.1992), the supreme court stated the burden of proof required of claimants seeking compensation for work related injuries. "[A]s in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence." La.R.S. 23:1021(1) defines an "accident" as "an unexpected or unforeseen *145 actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." The supreme court identified the presumption of disability, relied upon by Mr. Darby, in Lucas v. Ins. Co. of North America et al., 342 So.2d 591, 596 (La.1977), which stated:
A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. (citations omitted.)
In the present case the WCJ held that there was not "a reasonable possibility of causal connection" between the accident and Mr. Darby's disabling condition. In light of the evidence in the record, we do not believe that the WCJ was manifestly or legally erroneous in reaching this conclusion. The statements and conclusions presented by Dr. Mack and Dr. Cobb in their deposition testimony provide sufficient evidence to support the WCJ's conclusions. Dr. Mack testified that he would "imagine that [Mr. Darby] would have been in considerable pain" during the week he continued working after the accident. Yet Mr. Darby, according to his employer, never mentioned a back injury. He only referred to his alleged knee or leg injuries. Dr. Mack also stated that it would be surprising for Mr. Darby to fail to develop back or neck symptoms within the week he continued working for Mr. Richard. He speculated that Mr. Darby would have developed his current neck and back symptoms within three or four days of the accident occurring, and "certainly within the first week after the accident."
The WCJ also gave great weight to the video evidence presented by the appellee. We recognize that it is not necessary for Mr. Darby to be completely homebound or bedridden to support a finding that he has sustained a compensable injury. Mr. Richard presented video tape evidence at the hearing, however, which shows Mr. Darby engaged in various activities on three separate days. This video directly contradicts several statements made by Mr. Darby concerning his symptoms and the severity of his alleged disability.
Mr. Darby stated that he was unable to bend over for any period of time without pain. The video clearly shows Mr. Darby crouched by his vehicle for several minutes, checking the air level in his tires with no apparent difficulty. He also stated that he was unable to lift or carry even light grocery bags. This statement was later corrected and Mr. Darby indicated that he could carry only very light grocery bags containing items like bread. Despite these statements, the video shows Mr. Darby carrying a gas container with approximately $1.50 worth of gasoline in it. It also shows him bending while holding the gasoline container and using it to fill his gas tank.
In addition, Mr. Darby was adamant in his assertion that he now walks with a limp "most of the time." Despite this claim the video shows him walking significant distances, and carrying substantial items, yet never walking with a limp and walking at a relatively quick pace. Even when confronted at the hearing with the video evidence clearly showing him walking normally Mr. Darby amazingly continued to claim that he was limping while walking in the video footage. The WCJ found no evidence of this limp while viewing the tape, *146 nor do we upon our own viewing of the video. Mr. Darby was also confronted on his earlier testimony that as a result of his injuries he was unable to do things as simple as getting in and out of a car. Yet on viewing the tape, Mr. Darby admitted that he was shown entering and exiting his vehicle repeatedly with no apparent difficulty or discomfort.
In his reasons for judgment the WCJ also referred to statements concerning his injuries, which Mr. Darby claims he made to Officer Pellerin and Mr. Richard at the scene of the accident. Mr. Darby testified that he informed both Mr. Richard and Officer Pellerin that he hurt his knees in the accident. During testimony neither Officer Pellerin nor Mr. Richard could corroborate this. Mr. Darby also testified that he was bleeding from the knees and limping at the scene of the accident and that Mr. Richard witnessed as much. Mr. Richard did not corroborate this. Officer Pellerin testified that he watched Mr. Darby walk around the scene of the accident and he never saw Mr. Darby limp. Additionally, Dr. Mack testified to seeing a "small superficial laceration of the skin overlying the kneecap which was in the process of healing." The WCJ questioned how anything but a severe cut requiring immediate medical treatment would still be healing five weeks after the alleged injury. Mr. Richard testified that after being fired Mr. Darby returned on two separate occasions to obtain paychecks. On both occasions he failed to mention any injury resulting from the on-the-job accident, or a workers' compensation claim.
In the conclusions of law stated in the WCJ's written reasons for judgment, he states that the court did not accept the claimant's testimony that he was disabled or injured in the November 20, 2000 accident. The WCJ highlights the fact that the claimant continued to work after the accident for a full week with no apparent difficulty and did not seek medical treatment for his alleged injury until after he was fired from his job. The WCJ further noted that Mr. Darby did not seek medical treatment until his attorney arranged an office visit approximately five weeks after the date of the accident. The WCJ also found that Mr. Darby failed to meet his burden of proof with respect to medical causation. Dr. Mack and Dr. Cobb relied on the history of the patient in relating his injuries to the accident. Since the court found Mr. Darby to be an unreliable witness, it also deemed the history he provided the doctors to be unreliable.
In light of the overall lack of corroboration for Mr. Darby's statements to others regarding the extent of his injuries as a result of the November 20, 2002 accident, and in conjunction with Mr. Darby's general lack of credibility in several other areas of testimony, we find no error on the part of the WCJ in accepting Officer Pellerin's and Mr. Richard's recollection of Mr. Darby's stated injuries at the time of the accident. We also find no error, legal or otherwise, in the WCJ's conclusion that Mr. Darby failed to establish that he suffered a compensable injury in the on-the-job accident of November 20, 2000.

Assignment of Error # 2
In Mr. Darby's second assignment of error he asserts that the WCJ erred in entertaining his employer's claims under La.R.S. 23:1208, inasmuch as the office of workers' compensation lacks subject matter jurisdiction over such claims. He based this argument on our holding in Lanthier v. Family Dollar Store, 02-429 (La.App. 3 Cir. 10/2/02); 827 So.2d 547, vacated by, 2002-2663 (La.11/27/02); 836 So.2d 5. Mr. Darby asserts that, although the constitutionality issue was not raised below, we should consider it because the *147 statute was declared unconstitutional by this court after the appeal was lodged.
In Lanthier, we expressed concern regarding the civil and criminal penalties Section 1208 allows workers' compensation judges to impose.
[T]his court is troubled by the grant of power provided in La.R.S. 23:1208, which permits the Office of Workers' Compensation to impose criminal penalties against those in violation of the statute. As the court found in Rivera v. West Jefferson Medical Center, 96-152, p. 17 (La.App. 5 Cir. 7/30/96); 678 So.2d 602, 611, we also find:
There is a fundamental difference between criminal and civil matters. (Citation omitted). Criminal prosecutions put the defendant at risk of losing basic personal freedoms which are protected by both the United States and the Louisiana Constitutions. As such, criminal prosecutions must be conducted within the strict confines of the criminal justice system. There is no provision in the Worker's Compensation Chapter which authorizes a hearing officer to convict a claimant of criminal activity and sentence him accordingly.
Lanthier, 827 So.2d at 550-51.
In a concurrence to Boise Cascade Corp. v. Dean, 99-1356, pp. 8-10 (La.App. 3 Cir. 5/3/00); 767 So.2d 76, 86-87, writ denied, 2000-2505 (La.11/13/00); 774 So.2d 146, I discussed the constitutionality of 1208's criminal sanctions. I reiterate that discussion here.
Clearly, it is the very criminality of the statute [La.R.S. 23:1208] that places it in peril. In Grant, 696 So.2d 73, we discussed fraud as a civil tort matter. But a civil tortfeasor does not risk imprisonment, so it is now appropriate to consider when fraud becomes a criminal matter. A sanction is penal when it is "punishable; inflicting a punishment; containing a penalty, or relating to a penalty." (Citation omitted). A crime is any conduct so defined by the Criminal Code, by other acts of the legislature, or by the Louisiana Constitution. La.R.S. 14:7.
. . . .
La.R.S. 23:1208 unquestionably provides for severe criminal sanctions, particularly where in Subsection (C)(1) and (C)(2) an offender may be subject to ... felonious imprisonment at hard labor. The fundamental concerns that arise in a criminal setting are absent in civil matters, hence the need for the added procedural devices to safeguard the constitutional rights of the accused. In a criminal case, ... procedural protections sufficient to afford due process are provided through criminal procedural rules.
. . . .
In sum, with La.R.S. 23:1208, ... [d]efendant enjoys none of the procedural safeguards of a criminal proceeding; nevertheless, he is subject to the sanctions of a penal statute. La.R.S. 23:1208, ... in disregard of constitutional due process, is nothing more than a criminal statute masquerading in civil garb, designed to discourage fraud in workers' compensation matters with over-broad penalization.
In Lanthier, 827 So.2d at 551-53, we also addressed 1208's defects with respect to its civil penalties section. Because those arguments still apply and are equally applicable now, we restate them.
The adjudication of criminal conduct is not the sole constitutional infirmity posed by La.R.S. 23:1208. The determination of tortious conduct by the OWC under La.R.S. 23:1208 is violative of our constitution as well. Grant v. Natchitoches Manor Nursing Home, 96-1546 *148 (La.App. 3 Cir. 5/14/97); 696 So.2d 73, writ denied, 97-1582 (La.10/17/97); 701 So.2d 1330 explained:
Thus, it appears that when an employee violates La.R.S. 23:1208, his actions are tortious in nature (the conduct may even be considered criminal in nature), rather than a workers compensation matter. At best, the conduct prohibited by La.R.S. 23:1208 presents a cause of action in tort for fraud or deceit.
. . . .
In Coleman v. Sheraton Pierremont, 25,452 (La.App. 2 Cir. 1/19/94); 631 So.2d 50, 53, citing Sampson v. Wendy's Management, Inc.[,] 593 So.2d 336 (La. 1992), the supreme court noted "that a retaliatory discharge cause of action found in the chapter on worker's compensation was not a worker's compensation matter to be heard by administrative hearing officers, since the cause of action was in tort and/or a claim for civil penalties." Following the reasoning in Sampson, we find that the penalties meted out by the hearing officer in accordance with La.R.S. 23:1208 against claimant clearly were not "directly associated with the employee's work-related injury," Sampson, 593 So.2d at 339. Instead, the nature of the cause of action embodied in La.R.S. 23:1208 is tortious/delictual in nature, falling beyond the jurisdictional authority of the hearing officer as authorized by La. Const. Art. V, §§ 10(A)(B), §§ 16(A), La.R.S. 23:1310.3. Clearly, the misconduct characterized by La.R.S. 23:1208 falls within a well recognized area of tort law (the tort of fraud/deceit), and thus we conclude that the hearing officer and the Office of Workers' Compensation lacked jurisdiction to impose sanctions under La.R.S. 23:1208. Additionally, La.R.S. 23:1291(B)(5), entitled "Creation, powers, and duties of the office of worker's compensation administration," states: To establish and promulgate in accordance with the Administrative Procedure Act such rules and regulations governing the administration of this chapter and the operation of the office as may be deemed necessary and which are not inconsistent with the laws of this state. (Emphasis added). To allow the OWC power to adjudicate tortious and criminal conduct is antithetical to, and inconsistent with, the clear constitutional directions of Article 5, Section 1; Article 5, Section 16; and Article 2, Section 2 of the Louisiana Constitution. The constitution must take precedence. Louisiana Revised Statutes 23:1208 is unconstitutional.
In addition to 1208's unconstitutional grant of jurisdiction over tortious and criminal conduct to the Office of Workers' Compensation, an administrative agency, the statute also raises substantial due process concerns. As written, Section 1208 requires the complete forfeiture of all compensation rights even for relatively minor misrepresentations. In his dissent to the majority opinion in St. Bernard Parish Police Jury v. Duplessis, 02-632, p. 1 (La. 2002); 831 So.2d 955, 961, Justice Calogero noted the disproportionate severity of the penalties required under the current interpretation of Section 1208 in light of the relatively minor nature of possible infractions.
Further, I note that La.Rev.Stat. 23:1208, as it is interpreted by the majority, results in a draconian penalty that deprives workers' compensation claimants of their rights to compensation not reasonably related to or otherwise impacted by the misrepresentation. Because of the joint benefits flowing from the workers' compensation scheme in favor of employees and employers, an employee is required to waive his rights to *149 pursue tort remedies against employers in consideration for which he receives a percentage of his salary during the period of his disability. To further deprive the claimant of his workers' compensation benefits because of a fraudulent claim for reimbursement of mileage expenses related to his attainment of medical treatment is a gross penalty that should be permitted only if the statutory provision is clear and unambiguous. Not only is the provision not clear and unambiguous in this case, but it is difficult to believe that the Legislature intended for the provision to have such a harsh effect. On the other hand, if the majority is right and the statute has to be interpreted as they hold, I suggest that the Legislature should reconsider whether workers' compensation statutory reform should extend this far.
Where the severity of the punishment so clearly outweighs the severity of the infraction, as in the misrepresentations involving mileage reimbursement discussed by Justice Calogero above, employees are effectively denied their due process rights.
Despite our continued contention that Section 1208 grants unconstitutional authority to Workers' Compensation Judges to impose criminal penalties and determine tortious conduct, as well as the argument by Justice Calogero above questioning the application of the statute as overbroad and unduly harsh, the Louisiana Supreme Court has not yet ruled that Section 1208 is, in fact, unconstitutional. The issue of constitutionality was not raised by the parties in Lanthier at any time during the proceeding, therefore the supreme court vacated the judgment of this court on procedural grounds and the case was remanded for further proceedings. As with Lanthier, Mr. Richard asserts that because the constitutionality issue was not raised at the trial level, it is not properly before this court. In support of this proposition, Mr. Richard cites La. R.S. 23:1310.3(F)(1), which states:
Any party challenging the constitutionality of any provision of this Chapter shall specially plead such an allegation in the original petition, an exception, written motion, or answer, which shall state with particularity the grounds for such an allegation.
Despite our ongoing concerns as to the application of La.R.S. 23:1208 by the Office of Workers' Compensation, and while we maintain the arguments against the constitutionality of Section 1208 previously raised by members of this court, the majority is of the opinion that, as was the case in Lanthier, the constitutionality of Section 1208 is not properly before the court. This writer feels that the constitutionality of Section 1208 is properly before the court and provides reasons in the dissent.

Assignment of Error # 3
In Mr. Darby's final assignment of error he asserts that the WCJ erred in finding a willful misrepresentation that warranted forfeiture under La.R.S. 23:1208. In Resweber v. Haroil Constr. Co., 94-2708, p. 7 (La.9/5/95); 660 So.2d 7, 12, the supreme court provided a clear test for the application of La.R.S. 23:1208. "The only requirements for forfeiture of benefits under Section 1208 are that (1) there is a false statement or misrepresentation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment."
In Menard v. Mama's Fried Chicken, 97-488 p. 2 (La.App. 3 Cir. 3/6/98); 709 So.2d 303, 304, writ denied, 98-956 (La.6/5/98); 720 So.2d 681, this court held that "[f]alse statements that are inadvertent or inconsequential will not result in forfeiture." However, we share the opinion *150 of the WCJ, that Mr. Darby's false statements in this matter were neither inadvertent nor inconsequential. Under the terms of Section 1208, the WCJ was not manifestly erroneous in holding that Mr. Darby's false statements and glaring inconsistencies and misrepresentations allowed for forfeiture of all compensation benefits under La.R.S. 23:1208.
The most blatant and damaging misrepresentation made by Mr. Darby was the highly inflated estimate of his weekly wages. We understand that the nature of the sugar cane hauling industry is such that wages are not fixed and the drivers' salaries are likely to fluctuate greatly from week to week. Mr. Darby's representations of his average weekly earnings, however, were so disproportionate as to his actual earnings as to be absurd. During his testimony at the hearing Mr. Darby stated that he earned between $900.00 and $1,200.00 per week. Even when Mr. Darby submitted his correction sheet to adjust errors made during his deposition he merely adjusted his estimated weekly income from "$1,300.00 a week" to "$1,300 a week or a little less." Mr. Darby's actual weekly gross prior to his accident totaled anywhere from $180.00 per week to $815.00 per week. At no point did his weekly earning ever approach $1,300.00. In fact, his average weekly wage, based on the payment information provided by his employer, was approximately $389.00 per week. Such a gross misrepresentation concerning earned wages is precisely the type of material misrepresentation Section 1208 was enacted to prevent.
Mr. Darby's clearly fraudulent misrepresentation of his weekly earnings alone provides sufficient support for the WCJ's determination that Mr. Darby violated 1208. Combined with Mr. Darby's statements concerning the severity of any physical symptoms associated with his alleged injury discussed in his first assignment of error, we find the WCJ had adequate evidence of a violation of Section 1208. Similarly, we find no error in the WCJ's imposition of a $5000.00 fine against Mr. Darby for his violation of Section 1208. Therefore, Mr. Darby's third assignment of error is also without merit.
Ultimately this case comes down to the credibility of the witnesses. The WCJ concluded that Mr. Darby was not a credible witness due to the inordinately large number of inconsistencies in his testimony at the hearing as well as during his deposition. We find that the WCJ was not manifestly erroneous in determining that Mr. Darby's testimony was not credible.

DECREE
For the reasons stated above we affirm the finding of the WCJ. All costs of this appeal are assigned to the appellant, Mr. Darby.
AFFIRMED.
SAUNDERS, J., dissents and assigns written reasons.
WOODARD, J., concurs and assigns written reasons.
PICKETT, J., concurs.
SAUNDERS, J., dissents and written reasons.
It is the opinion of the majority that the constitutionality of La.R.S. 23:1208 is not properly before this court. While this writer agrees with the majority as to the affirmation of the Workers' Compensation Judge's ruling, I must dissent on the issue of constitutionality. As judges in the Louisiana Third Circuit, we give our oath to uphold the Constitution and the laws of the state. In my reading of this oath, our duty to uphold the Constitution of the state takes precedence over our duty to *151 uphold legislatively enacted state law. I feel it is necessary to follow the law of the Louisiana Constitution and refuse to apply this statute, as it is violative of the designation of jurisdiction to the district court in all civil and criminal matters.
Additionally, I find this case distinguishable from Lanthier v. Family Dollar Store, 02-2663 (La.11/27/02); 836 So.2d 5. In Lanthier, neither party raised the constitutionality issue at any point in the proceeding, either at trial or on appeal. Here, the claimant raised the issue on appeal after the WCJ found that he had violated Section 1208 and imposed a $5000.00 fine. There is some authority to be found for the proposition that it is not necessary for the claimant to anticipate affirmative defenses, and therefore, the constitutionality of Section 1208 may be raised on appeal and still be appropriate. See Harris v. Monroe Building and Loan Ass'n, 185 La. 289, 169 So. 343 (1935). This was not a matter of the court raising the issue of constitutionality on its own motion. For the above reasons I feel the majority should have reached the issue of the constitutionality of La.R.S. 23:1208 and found it to be unconstitutional for the reasons reiterated in the opinion.
WOODARD, J., concurring.
Respectfully, while I agree with the majority's ultimate result, I do not agree with the discussion regarding the alleged unconstitutionality of La.R.S. 23:1208. As Judge Saunders acknowledges, the majority does not believe that the issue is properly before the court. Nonetheless, he argues against the statute's constitutionality. Therefore, it is necessary to address his argument, notwithstanding, that the issue is not before us in the instant case.
Judge Saunders' main concerns are the criminal sanctions and civil penalties, which Section 1208 "allows workers' compensation judges to impose." I do not believe that Section 1208 allows a WCJ to impose criminal sanctions. While it does allow a WCJ to impose civil penalties, there is nothing unconstitutional in this grant of power.
A close reading of Section 1208 reveals that the statute, itself, does not give the WCJ the power to impose the criminal penalties or imprison claimants. This statute has been in effect, in some form, since 1914,[1] when, obviously, the district courts had jurisdiction. At that point, the violation was considered a misdemeanor, all penalties were provided for in the same subsection, and they could not be imposed without a conviction.[2]
However, since the creation of WCJ's in 1983,[3] the statute has continued to evolve; the different penalties, once provided for in the same section, were broken down into separate subsections. Nevertheless, the statute permits the WCJ to impose, only, the penalties in two of these subsections, neither of which is criminal in nature. Specifically, subsection (D) expressly grants the WCJ the jurisdiction to assess civil penalties and order restitution; subsection (E) expressly grants the WCJ the jurisdiction to determine a forfeiture of benefits.
Moreover, subsections (A) and (B) simply define the violation and, therefore, require no reference to jurisdiction. Subsection (C) is the allegedly offensive section, as it permits the imposition of criminal penalties. However, nothing in this section gives the WCJ the power to impose *152 these penalties. Therefore, the statute is not unconstitutional; rather, if the WCJ attempted to impose these penalties, s/he would be without jurisdiction to do so because the statute does not allow itnot because the Constitution does not allow it. Simply because this provision is located within the Worker's Compensation Code does not make it inherently the province of the OWC.[4] Nor, are all criminal statutes confined in location to the Criminal Code.[5]
I appreciate that the beginning language of subsection (D) is ambiguous in that it could be interpreted to mean that the WCJ, also, has the power to impose the criminal penalties under subsection (C). The language reads:

In addition to the criminal penalties provided for in Subsection C of this Section, any person violating the provisions of this Section may be assessed civil penalties by the workers' compensation judge[.]
(Emphasis added.) Notwithstanding, when a statutory provision has two permissible interpretations, one which makes it unconstitutional and one which does not, we are required to give it whichever interpretation will uphold its constitutionality.[6] "Statutes are presumed constitutional, and any doubt is to be resolved in the statute's favor."[7]
Additionally, I believe that a review of the statute's history reveals that the legislative intent supports my interpretation. The evolution of Section 1208, specifically, since the creation of WCJ's in 1983, is significant to an analysis of the statute in its current form. Before 1983, clearly, the district courts had exclusive jurisdiction over Section 1208 claims, as they had jurisdiction over all workers' compensation matters. In 1983, WCJ positions were established[8] and were granted jurisdiction over all worker's compensation matters.[9] In 1988, the Act was amended, but the Louisiana supreme court found the amendments to be unconstitutional to the extent that they divested district courts of original jurisdiction over workers' compensation claims.[10] Within two months of that ruling, the legislature responded with constitutional amendments which left original jurisdiction with the district courts, "except as heretofore or hereafter provided by law for administrative agency determinations in worker's compensation matters." (Emphasis added.) Nevertheless, I do not find that the criminal sanctions of Section 1208 constitute such an exception; therefore, the district courts have not been divested of the exclusive jurisdiction to impose them.
Furthermore, I believe that legislative history demonstrates that the split of jurisdiction between the WCJ and the district courts, based on the type of penalty involved, was intentional. As the statute evolved and the penalty sections were divided, the director of the OWC and the hearing officer were granted jurisdiction to impose the civil penalties and forfeiture of benefits.[11] These are the same penalties *153 which WCJs can currently enforce.[12] Thus, since the penalties were first divided into subsections, the legislature has maintained a consistency in specifically granting power to the OWC to impose the noncriminal penalties, yet it has not attempted a grant of power to the OWC to enforce the criminal provisions. Additionally, I do not believe that the explanation for this can be as simple as being a legislative oversight. It is not as if the legislature merely left the criminal provisions untouched while amending the other provisions. In fact, it did make amendments to Section 1208's criminal provisions.[13] Significantly, however, the amendments never included a transfer of jurisdiction to the WCJ's to enforce these criminal provisions.
Judge Saunders, also, challenges the constitutionality of Section 1208 because it allows the WCJ to impose civil penalties. However, the APA, which governs the administration of the Workers' Compensation Chapter,[14] clearly gives agencies broad enforcement powers,[15] including the assessment of civil penalties, as long as there is a statutory predicate for doing so.[16] He argues, further, that a Section 1208 violation is tortious in nature, rather than a workers' compensation matter and, therefore, violates the Constitution. He relies on Sampson v. Wendy's Management, Inc.[17] for this proposition.
However, the reasoning of Sampson cannot be applied to Section 1208. The retaliatory discharge statute at issue in Sampson was applicable when an employee or applicant had filed for benefits "under the provisions of this Chapter or under the law of any state or of the United States."[18] The court provided examples of the statute (1) having been applied in a former case because an employee was discharged for having previously filed a suit under the Jones Act and (2) another example which involved a claim under FELA.[19] The court noted that these examples demonstrated "the lack of connexity between the retaliatory discharge claim and the worker's compensation claim."[20] Thus, it found that the retaliatory discharge statute addressed:
[A]n employment law issue which may arise in a variety of circumstances, one of which happens to involve workers' compensation claims ... [a]ccordingly, it would be illogical to require employees who did not assert a claim under the Louisiana Worker's Compensation Act to file their claim for retaliatory discharge with this state's Office of Worker's Compensation Administration.[21]
Conversely, Section 1208 applies only to claims made "for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter." The authority to impose civil penalties, restitution, and forfeiture is patently limited to a determination involving only the particular claim, at issue, which must have been brought under the Louisiana Worker's Compensation Act. Accordingly, the limiting language of Section 1208 ensures the *154 exclusion of matters that are so attenuated to worker's compensation claims as are the scenarios referred to in Sampson.
Furthermore, I cannot subscribe to the proposition that 1208 is unconstitutional simply because it entails a determination of fraudulent conduct, which presents an action in tort. Judge Saunders supports his contention with a Second Circuit case.[22] However, the Second Circuit's decision followed the reasoning of Sampson, which is inapplicable for the reasons already addressed. Additionally, the Second Circuit distorts La.R.S. 23:1291 in support of its argument. It found that:
La.R.S. 23:1291(B)(5), entitled "Creation, powers, and duties of the office of worker's compensation administration," states: To establish and promulgate in accordance with the Administrative Procedure Act such rules and regulations governing the administration of this chapter and the operation of the office as may be deemed necessary and which are not inconsistent with the laws of this state.[23]
However, the quote skips a significant portion of the article which states that it is the Director who has the duty "to establish... rules ... not inconsistent with the laws of this state."[24] Section 1208 is a law, which the legislature enacted, not a rule that the Director promulgated. Thus, in context, La.R.S. 23:1291 does not apply to the Second Circuit's argument that 1208 (a lawnot a rule) is inconsistent with the laws of the statethe laws, in this case, being the Constitution. Notwithstanding, this is a minor point, considering that we do not need statutory authority to find a law unconstitutional if it is inconsistent with our Constitution.
However, our Constitution clearly and explicitly makes an exception to district court jurisdiction over workers' compensation matters.[25] Thus, the real question becomes whether the determination of fraud under Section 1208 is a workers' compensation matter. There is no jurisprudence or other authority indicating that the ability to label an action as a tort takes it out of the realm of workers' compensation. The Constitutional amendments to Article V, Sections 10 and 16, were clearly in response to the supreme court's decision in Moore.[26] In Moore, the court viewed workers' compensation matters as civil matters, making a clear distinction between civil and criminal mattersnothing more.[27] As this is the case that elicited a response from the legislature, amending the Constitution to overrule it, there is no reason to believe that the amendments granting the WCJ's jurisdiction do not encompass all civil matters, as long as they are also workers' compensation matters. As already noted, Section 1208 determinations are limited to claims made "for the purpose of obtaining or defeating any benefit or payment" under the Louisiana Workers' Compensation Code. Accordingly, such claims are workers' compensation matters and are permissible under our Constitution.
Furthermore, administrative agencies are often empowered with the ability to make determinations that, otherwise, would constitute a tort action. For example, many of the statutes that the Department *155 of Environmental Quality, an agency which the APA also governs,[28] is empowered to enforce, likewise, could give rise to a tort action on a theory such as nuisance. However, this does not divest them of jurisdiction, nor does it render the statutes unconstitutional. And, specifically, DEQ is also entrusted with the power to evaluate a violator's subjective intent and upon finding "the violation was done intentionally, willfully, or knowingly," may increase the civil penalties.[29] The statute establishing this power is similar in structure to 1208 in that criminal penalties are provided for in this same statute, even though that statute clearly states that the criminal penalties cannot be levied without the district attorney's prosecution.[30] I believe that reason dictates that the same is true for Section 1208; although, I do not deny that the section could be more artfully drafted.
Therefore, while I agree with Judge Saunders that WCJs are without jurisdiction to impose criminal penalties under 1208, I find that it is because the statute, itself, does not grant the jurisdiction and not because the statute is unconstitutional.
NOTES
[1] La.R.S. 23:1208 (originally enacted as Acts 1914, No. 20, § 37(1)).
[2] Id.
[3] La.R.S. 23:1310.1.
[4] Sampson v. Wendy's Management, Inc., 593 So.2d 336 (La.1992).
[5] La.R.S. 14:7.
[6] State v. Brenner, 486 So.2d 101, 103; see also State v. Dillon, 95-884 (La.App. 3 Cir. 1/31/96); 670 So.2d 278.
[7] State in the Interest of J.A.V. (La.1990); 558 So.2d 214, 216.
[8] La.R.S. 23:1310.1.
[9] La.R.S. 23:1310.3.; see also Sampson, 593 So.2d 336.
[10] Moore v. Roemer, 567 So.2d 75 (La.1990).
[11] La.R.S. 23:1208 (amended 1992).
[12] La.R.S. 23:1208(D)(E).
[13] La.R.S. 23:1208 (amended 1992) (amended 1993).
[14] La.R.S. 23:1291(B)(5).
[15] La.R.S. 49:966(A).
[16] See e.g. La.R.S. 30:2025(E).
[17] 593 So.2d 336 (La.1992).
[18] Id. at 340.
[19] Id.
[20] Id. at 340.
[21] Id. at 339-40.
[22] Coleman v. Sheraton Pierremont, 25,452 (La.App. 2 Cir. 1/19/94); 631 So.2d 50.
[23] Id. at 53.
[24] La.R.S. 23:1291.
[25] La. Const. art. V, § 16; La. Const. art V, § 10.
[26] 567 So.2d 75 (La.1990).
[27] Id.
[28] La.R.S. 30:2019.
[29] La.R.S. 30:2025(E)(1)(A).
[30] See La.R.S. 30:2025.